# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL MARCUS GANN,<br><br>Plaintiff,<br><br>v.<br><br>DR. W. KOKOR, et al.,<br><br>Defendants. | Case No. 1:18-cv-00084-AWI-BAM (PC)<br><br>FINDINGS AND RECOMMENDATIONS TO DISMISS CERTAIN CLAIMS AND DEFENDANTS<br><br>**FOURTEEN-DAY DEADLINE** |

Plaintiff Nathaniel Marcus Gann ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action under 42 U.S.C. § 1983. On July 11, 2018, the Court screened Plaintiff's complaint and granted him leave to amend. (ECF No. 21.) Plaintiff's first amended complaint, filed on August 30, 2018, is currently before the Court for screening. (ECF No. 24.)

**I.      Screening Requirement and Standard**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity and/or against an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). Plaintiff's complaint, or any portion thereof, is subject to dismissal if it is frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915A(b).

1

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).

To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678 (quotation marks omitted); Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). The sheer possibility that a defendant acted unlawfully is not sufficient, and mere consistency with liability falls short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678 (quotation marks omitted); Moss, 572 F.3d at 969.

**I.     Plaintiff's Allegations**

Plaintiff is currently housed at Valley State Prison in Chowchilla, California. The events in the complaint are alleged to have occurred at the California Substance Abuse Treatment Facility ("CSATF") in Corcoran, California. Plaintiff names the following defendants: (1) Dr. Winfred Kokor; (2) Dr. J. Enenmoh, Chief Physician and Surgeon; (3) Dr. C. Cryer, Chief Executive Officer; (4) CSATF/CDCR; (5) Dr. Nastran Hashemi; (6) CME/CMO Godwin Ugwueze; (7) Dr. Ngozi Igbinosa; (8) D. Roberts, RN; (9) Stronach, RN; (10) Villasenor, LVN; (11) L. Arietta, nurse; (12) M. Pacheco, nurse; and (13) Does 1, 2 and 3, CSATF nurses. Plaintiff asserts claims for cruel and unusual punishment regarding his medical needs, and state tort claims for medical malpractice and res ipsa loquitur.

Plaintiff alleges that he has pancreatic atrophy. In December 2014, Plaintiff was housed at CSATF in Facility E and was assigned Dr. Kokor as his primary care physician.

On January 3, 2015, without having met Plaintiff, Dr. Kokor prescribed SUMAtriptan and levalbuterol tartrate. Plaintiff is allergic to SUMAtriptan, which causes "sensory ephasia."

On January 13, 2015, Plaintiff met with Dr. Kokor and raised concerns about his

neurological symptoms, asthma, hearing, and significant, worsening abdominal pain. Dr. Kokor prescribed Topamax and SUMAtriptan. Plaintiff informed Dr. Kokor that he was mildly allergic to SUMAtriptan and moderately to severely allergic to Topamax, causing "sensory ephasia" and urine retention respectively, which was why Plaintiff was no longer taking them. Dr. Kokor stated that it was not a real side effect, and said, "So what you can't pee." (ECF No. 24 at 14.) When Plaintiff asked about his abdominal pain, Dr. Kokor opined that it was only heartburn and prescribed Ranitidine. Plaintiff told Dr. Kokor that the pain was greatest when he tried to eat and it caused vomiting. Dr. Kokor said, "If it hurts to eat, then don't eat." (Id.) Dr. Kokor then prescribed ibuprofen and instructed Plaintiff to leave. Dr. Kokor reportedly did not perform any evaluation.

On March 10, 2015, Dr. Kokor re-prescribed SUMAtriptan. Plaintiff was called to medical and told to take the medication.

On March 16, 2015, Dr. Kokor re-prescribed SUMAtriptan. Plaintiff was called to medical to take the medication.

On March 25, 2015, Plaintiff submitted a Health Care Services Request form for pain, drowsiness, and stomach problems. The complaint was received by RN Stronach. Plaintiff met with RN Stronach the following day and expressed his concerns. Plaintiff believed the cause was his gastrointestinal problems, which had intensified, causing him to become ill when eating, nausea and vomiting, and insatiable hunger. Plaintiff also had light-headedness, dizziness, fatigue and lack of energy. RN Stronach reportedly made light of Plaintiff's complaints and stated, "So let me get this straight, you get tired during exercise?" (Id. at 15.) Plaintiff explained that was not the case and emphasized his inability to eat without nausea or vomiting. RN Stronach mocked Plaintiff and left the room allegedly to speak with Dr. Kokor. RN Stronach instructed Plaintiff to take ibuprofen. Plaintiff believed that Dr. Kokor ordered routine blood work.

On March 28, 2015, Dr. Kokor reviewed and re-prescribed medication.

On April 9, 2015, Plaintiff provided a blood sample for evaluation. The results were reported on April 10, 2015, and Dr. Kokor received them on April 12, 2015. The sample revealed

that Plaintiff's blood was fairly healthy.

On April 13, 2015, Dr. Kokor authored a Notification of Diagnostic Test Results, noting that the results were essentially within normal limits.

On April 21, 2015, Plaintiff met with Dr. Kokor, who did not conduct an examination. Plaintiff expressed his concern regarding the numerous pills he was being told to take. Dr. Kokor said, "Then don't take them and refuse treatment." (ECF No. 24 at 16.) Plaintiff asked Dr. Kokor for help and reported that he could not eat and it hurt across his back and stomach. Plaintiff also expressed difficulty urinating because of the Topamax. Dr. Kokor said, "You don't want to take it because it is UHT heat medication." (Id.) Plaintiff then explained that ibuprofen was only making his back and stomach pain worse. Dr. Kokor said, "I don't care. All inmates are liars; you are a liar." (Id.) Dr. Kokor then stated that Plaintiff had a little heartburn. He also stated that he could see Plaintiff's acne and runny nose, which he could treat. Plaintiff was on the verge of tears because he was convinced he was dying. When Plaintiff asked for instruction and assistance with his inability to eat or drink and his lack of energy, Dr. Kokor instructed him to eat a piece of candy. Dr. Kokor denied Plaintiff's request to see a specialist, and prescribed ibuprofen and SUMAtriptan.

On June 29, 2015, Plaintiff again met with Dr. Kokor and said that he had been coughing up a thick, black, chunky substance (blood). Dr. Kokor said it was natural to cough up blood, but Plaintiff told Dr. Kokor that the treatment was not working. Dr. Kokor told Plaintiff he could refuse treatment and leave. Plaintiff tried to explain that he was in distress, but Dr. Kokor called him a liar and said Plaintiff was only trying to get drugs. Dr. Kokor did not want to talk any more with Plaintiff and directed correctional staff to escort Plaintiff out of medical. Dr. Kokor again prescribed ibuprofen, Ranitidine, and SUMAtriptan.

On July 21 and 22, 2015, Dr. Kokor re-prescribed medication.

On September 2, 2015, Plaintiff again met with Dr. Kokor. Plaintiff's temperature and pulse were above normal, but Dr. Kokor refused to address these issues. Plaintiff told Dr. Kokor that he was suffering from significant abdominal pain. Dr. Kokor instructed Plaintiff to drink more water. Dr. Kokor reportedly ignored Plaintiff's symptoms and said Plaintiff was fine. He

planned to refer Plaintiff for a contact lens fitting, which was later cancelled. Plaintiff asked Dr. Kokor to evaluate him, explaining that the medications were making him worse not better. Plaintiff also said that it was not heartburn or back pain, but stomach to kidney pain. Dr. Kokor reportedly stated that he was the doctor and where he was from, Plaintiff would die. Dr. Kokor then had custodial staff escort Plaintiff out of medical. Dr. Kokor re-prescribed the same medication.

On October 28 and 29, 2015, Dr. Kokor reviewed and re-prescribed Plaintiff medication.

On December 20, 2015, Plaintiff's gastro-intestinal/abdominal pain intensified. He went to medical, but was told to return on Monday by Doe 1.

On December 21, 2015, Plaintiff went to medical and was instructed to return later. When Plaintiff later returned, he was told that he would be called out when medical had time. Plaintiff's condition continued to worsen, but he was never called out by Doe 1.

On December 22, 2015, Plaintiff went to medical and was instructed to return to his assigned housing. Plaintiff insisted that he be seen. Doe 2 told Plaintiff that the doctor would not see him.

On December 23, 2015, Plaintiff was gravely ill and had been unable to consume water for over 24 hours. Plaintiff again went to medical and was turned away by Doe 3. Plaintiff was told to put in a slip and he would be seen within 5 days.

Plaintiff submitted a Health Care Services Request Form and indicated it was an emergency, citing vomiting, vertigo, loss of extremity sensation and loss of consciousness. The form was turned in to Doe 3, who scoffed and placed the request in the box. Plaintiff informed Doe 3 that he needed to see a doctor and it was an emergency. Doe 3 told Plaintiff to wait until he was called out.

That same day, Plaintiff went to chow at his assigned time. He was accompanied by other inmates who assisted him to walk. While at the dining hall, Plaintiff lost the capacity to walk or stand. He was picked up by other inmates and carried to correctional staff. Correctional staff instructed the inmates to carry Plaintiff to the gym where medical was currently operating.

After being carried to the gym, Plaintiff was placed onto a small armless chair. Doe 3

stated, "I told you, go away—we'll call you in a few days." (Id. at 20.) Plaintiff responded, "I can't walk. I can't stand. I can't feel my body." Doe 3 turned away from Plaintiff and left. Sometime later, Plaintiff began to vomit blood and bile. He was given a trashcan. After vomiting, Plaintiff fell to the floor, knocking his head and beginning to choke. Doe 3 stated, "I don't give a f[***], he can lay there and die." (Id.)

Correctional staff entered the gym, saw Plaintiff on the floor and instructed him to rise. Plaintiff was unable to comply. Correctional staff then asked if they were going to check Plaintiff or if staff had to hit the alarm. Doe 3 then came over and placed a blood pressure machine on Plaintiff. The first three attempts resulted in an error. Doe 3 then had Plaintiff held upright to get a reading. Plaintiff was placed back onto a chair that had been moved so that Plaintiff could lean against the wall. At that time, Plaintiff began to heave, fell to the floor and lost consciousness. He later awoke on a gurney.

Plaintiff's vitals revealed that his temperature was approximately 3 degrees above normal, his heartrate was 50% higher than normal and he had pain and measurable symptoms in his abdomen. Plaintiff was evaluated by Dr. Scharffenberg, who sent Plaintiff via ambulance to the emergency room at Mercy Hospital. Prior to transport, he was given intravenous fluids for dehydration.

Upon arrival at the hospital, an ultrasound revealed abnormalities in Plaintiff's abdomen. A CT scan with contrast revealed pancreatic atrophy, particularly of the pancreatic head and ulcinate process. Plaintiff also had abnormal bilirubin.

On December 24, 2015, Plaintiff met with a specialist, Dr. Rajeev Krishan. Dr. Krishan ordered an esophagogastroduodenoscopy, which revealed systemic disease, including a hiatal hernia, gastritis, and duodenitis.

On December 25, 2015, Plaintiff advanced from IV feeding to clear fluids. Dr. Mushtaq Ahmed, who was in charge of Plaintiff's care, spoke to Plaintiff about his illness, tests and results. A CAT scan revealed pancreatic atrophy resulting from a chronic illness. Plaintiff's stomach and upper intestines also were swollen and bleeding, which had prevented Plaintiff from being able to eat or drink, and there was a herniation of the connective tissue. Plaintiff was

instructed to be careful with his diet and should avoid fatty and spicy foods along with NSAIDs. It was explained to Plaintiff that the pancreatic atrophy was believed to be caused by repeated episodes of pancreatitis.

On December 26, 2015, Plaintiff was discharged from the hospital with final diagnoses of: duodenitis, gastritis, hiatal hernia, asthma, dehydration and chronic pancreatic atrophy. Plaintiff had no current signs of active pancreatitis and his gallbladder was clear. The pancreatic atrophy was documented upon Plaintiff's return to CSATF by Dr. Scharffenberg. Plaintiff was instructed to eat a high protein diet and continue with a vitamin/food supplement.

On December 30, 2015, Plaintiff saw Defendant Kokor for medical care. Dr. Kokor did not conduct an examination, but Plaintiff shared what led him to the hospital. Dr. Kokor interrupted and told Plaintiff, "You are fine; just heartburn. Take antacid and Ibuprofen for pain. I not give it so you buy it at canteen." (Doc. No. 24 at 24.) Plaintiff explained that he was specifically told not to take NSAIDs, but remained in significant pain when eating or moving around. Dr. Kokor stated, "You don't need to eat every day. Let it heal." (Id.) Plaintiff claims that this shows Dr. Kokor knew there was an injury, damage and pain.

Plaintiff also showed Dr. Kokor the paperwork and instructions from the hospital. Dr. Kokor pushed them away, stating "I don't care what is wrong with you; if it doesn't say it in computer it no exist." (Id.) Plaintiff advocated for another doctor or a referral to a specialist, but Dr. Kokor retorted, "We are not required to do what they say. I am physician, you are inmate. You don't ask for specialist." (Id.) Dr. Kokor said that he would see Plaintiff in six months and had custodial staff escort him out of medical.

On January 18-19, 2016, Plaintiff was evaluated, and it was documented that he was still suffering from untreated pain across his abdomen and lower back.

On February 9, 2016, Plaintiff was interviewed by Nurse Carrasquillo for his appeal. It was documented that Plaintiff's instructions for discharge included a low-fat diet, vitamins, high protein, high carbohydrates, and avoid NSAIDs. Dr. Kokor's notes were used to deny the appeal, but Nurse Carrasquillo took the information directly to the CME (CMO) Defendant Dr. C. Cryer.

On February 19, 2016, the information was taken to Defendant Dr. J. Enenmoh. It was

documented that he was to have a low-fat diet, vitamins and calcium supplements, high protein and high carbohydrates. Dr. Kokor's notes again were used to deny the appeal and treatment. It was determined that Plaintiff would be followed by his new primary care physician at an unspecified time.

On April 7, 2016, Plaintiff met with his new primary care physician, Defendant Dr. Ngozi Igbinosa. Dr. Igbinosa did not conduct an examination of Plaintiff, but Plaintiff shared that he was suffering from continued pain in his abdomen, was having difficulty eating, was suffering from a severely damaged back and leg from a seizure induced fall, and he was unable to exercise or exert himself. The possibility of a heart problem was discussed but dismissed after Plaintiff reported that a previous EKG had revealed only a minor artifact. Dr. Igbinosa told Plaintiff that he was fine and not suffering any ill effects. Plaintiff objected and expressed concern with his continued pain in his leg, back, abdomen and head.

On April 19, 2016, Plaintiff submitted a Health Care Services Request form that was received by Defendant Roberts. Defendant Roberts did not refer Plaintiff to his primary care physician after Plaintiff reported that he could not take Ibuprofen because of the problems with his abdomen. Defendant Roberts told Plaintiff to "man up" and wait a month for the doctor. Defendant Roberts then claimed that Plaintiff had refused pain medication.

On May 11, 2016, Plaintiff submitted an urgent request for medical help, which was received by Defendant Arietta. Defendant Arietta told Plaintiff to take Ibuprofen and drink water. Defendant Igbinosa agreed.

Later that day, Plaintiff was carried from his cell to the officer's station by other inmates. The correctional officer instructed Plaintiff to walk to medical, but Plaintiff was unable to comply and collapsed. Plaintiff subsequently awoke on a gurney while being administered oxygen by LVN Villasenor. Plaintiff was in severe pain and taken to TTA.

Upon arriving at TTA, Defendant Igbinosa was consulted and ordered that Plaintiff be administrated Ibuprofen. She also prescribed a daily regimen of ibuprofen despite Plaintiff's health concerns. Plaintiff was carried back to the facility, limping heavily and in severe pain.

On May 12, 2016, Plaintiff met with Defendant Igbinosa. Plaintiff was brought to

medical in a wheelchair.  At Defendant Igbinosa's instruction, Plaintiff was forcibly removed from the wheelchair and dropped into the holding cage.  Defendant Igbinosa insisted that Plaintiff was fine and told him to take Ibuprofen for five days.  When Plaintiff informed her that he was unable to take any NSAIDs, she stated that they would inject him with it and perform an x-ray.  Defendant Igbinosa also prescribed five days of ibuprofen and an injection of Toradol.  An x-ray revealed spinal disease.

On May 17, 2016, Plaintiff submitted another urgent Health Care Services Request form.  Plaintiff alleges that it was effectively screened out by Defendant Arietta, who refused to refer Plaintiff to his primary care physician.  Plaintiff requested pain management, because the ibuprofen was ineffective and causing abdominal pain.

On May 19, 2016, Plaintiff was referred to medical by his work supervisor, C. Flores, due to a severe pain incident during which Plaintiff lay on the floor and sweated out the pain while his body shook.  C. Flores saw that Plaintiff was pale, and despite his objections, ordered Plaintiff to report to medical.

Plaintiff was seen by Defendants Arietta and Igbinosa.  Defendant Arietta told Plaintiff the problem was all in his head, despite having a broken back and pancreatic atrophy.  Defendant Igbinosa instructed Plaintiff to drink water and take ibuprofen.  Although Plaintiff informed Defendant Igbinosa of the side effects that he was suffering from the ibuprofen and its ineffectiveness, along with his concern that the hospital instructed him to avoid NSAIDs, Defendant Igbinosa stated that she did not care, and that Plaintiff could accept her advice or leave.  Defendant Igbinosa ultimately instructed Plaintiff to wait in the holding tank until custodial staff could take him to TTA for another Toradol injection.

On May 24, 2016, Plaintiff met with Defendant Igbinosa, who ordered physical therapy and more ibuprofen.  Plaintiff was referred to the MAR committee.  Defendant Igbinosa told him that she did not want to see him for the next three months.  She also accused Plaintiff of being a drug addict seeking drugs.

On May 26, 2016, the MAR committee met and decided to continue Plaintiff on NSAIDs (ibuprofen).  The case was presented by Defendant Igbinosa.

On May 29, 2016, Plaintiff submitted a Health Care Services Request form, which was screened out by Defendant M. Pacheco. Plaintiff reported that the injection was not working, and he had taken all of the NSAID ibuprofen.

On May 31, 2016, Plaintiff met with Defendant M. Pacheco and reiterated the problem with his stomach and pancreas, along with the restriction on taking NSAIDs. Plaintiff also reported severe pain. Plaintiff was instructed to take ibuprofen and not permitted to see the doctor.

On June 11, 2016, Plaintiff submitted a Health Care Services Request form, which was screened out by Defendant Arietta. Plaintiff reported the severity of his pain, but Defendant Arietta refused to refer Plaintiff to his primary care physician.

On June 13, 2016, Plaintiff met with Defendant Arietta, who instructed Plaintiff to stop submitting Health Care Service Request forms. Defendant Arietta said it would not help Plaintiff to see the doctor. Defendant Arietta then instructed Plaintiff to rub some ointment and take the ibuprofen. She also told him to get out and that she was tired of seeing him.

On July 1, 2016, Plaintiff submitted a Health Care Services Request form, which was screened out by Defendant Arietta. Defendant Arietta refused to refer Plaintiff to his primary care physician.

On July 5, 2016, Plaintiff met with Defendant Arietta, who told Plaintiff that he was already getting all the care he needed, and he should continue taking the ibuprofen.

On July 6, 2016, Plaintiff submitted a Health Care Services Request form, which was screened out by Defendant Arietta. Plaintiff was denied an interview, but Defendant Arietta later said that Plaintiff did not want to wait and was verbally defiant.

On July 13, 2016, Defendant Igbinosa prescribed ibuprofen and an ointment without contact with Plaintiff.

On July 15, 2016, Plaintiff underwent physical therapy, but remained in severe pain. Plaintiff continued on July 21 and August 3, 2016.

On August 1, 2016, Defendant Godwin Ugwueze was informed of Plaintiff's problems and severe pain. Defendant Ugwueze reviewed and approved the treatment.

10

On August 10, 2016, Defendant Nastran Hashemi re-prescribed Plaintiff's medication without consultation. Plaintiff believed that Defendant Igbinosa was moved to another area of the prison at this time due to complaints. He also believed that she was assisted by her husband, Dr. Felix Igbinosa, at another prison to avoid culpability for her actions.

On August 28, 2016, Plaintiff submitted a Health Care Services Request form that was screened out by Defendant Arietta. Plaintiff was denied an interview and referral to his new primary care provider. Plaintiff specifically requested a follow up on his pancreas.

On September 7, 2016, Plaintiff met with FNP-C A. Hales and Defendant Ugwueze. Plaintiff alleges that Defendant Ugwueze's primary purpose was to deter Plaintiff's family and friends from calling the prison concerning his treatment. Plaintiff was meeting with FNP Hales regarding a medical appeal about neurological symptoms. Defendant Ugwueze asked to watch the interview, but allegedly used his position to interfere with Plaintiff's medical appeal. As FNP Hales began to examined Plaintiff, Defendant Ugwueze physically stepped between them, stating it was not important and that he was fine. FNP Hales responded, "No, I will do my own examination." (Doc. No. 24 at 33.) Through the interview, Defendant Ugwueze would take Plaintiff's body parts from FNP Hales, twisting and turning them causing additional pain. Defendant Ugwueze stated that Plaintiff should have his people stop calling.

On January 18, 2017, Plaintiff had been prescribed Topamax because Defendant Kokor failed to document the allergic reaction. Emergency medical care was needed because Plaintiff could not empty his bladder. The allergy was finally properly documented.

Plaintiff asserts that he continues to suffer from pancreatitis without care or treatment due to the actions of defendants. He claims that the repeated prescription of NSAIDs combined with the threat to stop all medical treatment, including for his broken back, repeatedly forced Plaintiff to take the NSAIDs after defendants knew of the painful side effects and its ineffectiveness. Plaintiff continued to undergo mental health treatment as a result of the issues.

As relief, Plaintiff seeks compensatory and punitive damages, medical expenses, and injunctive relief.

**III. Discussion**

11

### A. Defendant CSATF/CDCR - Eleventh Amendment Immunity

Plaintiff is informed that the Eleventh Amendment prohibits federal courts from hearing a Section 1983 lawsuit in which damages or injunctive relief is sought against state agencies (such as CDCR) and individual prisons, absent "a waiver by the state or a valid congressional override...." Dittman v. California, 191 F.3d 1020, 1025 (9th Cir. 1999). "The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, 'an arm of the state,' its instrumentalities, or its agencies." See Fireman's Fund Ins. Co. v. City of Lodi, Cal., 302 F.3d 928, 957 n. 28 (9th Cir. 2002) (internal quotation and citations omitted), cert. denied, 538 U.S. 961 (2003). "The State of California has not waived its Eleventh Amendment immunity with respect to claims brought under § 1983 in federal court...." Dittman, 191 F.3d at 1025–26 (citing Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985)); see also Brown v. Cal. Dep't. of Corrs., 554 F.3d 747, 752 (9th Cir. 2009) (finding California Department of Corrections and California Board of Prison Terms entitled to Eleventh Amendment immunity). "However, under *Ex Parte Young*, 209 U.S. 123 [ ] (1908), the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." Fireman's Fund, 302 F.3d at 957 n. 28 (internal quotation and citation omitted). Therefore, Plaintiff cannot pursue claims for damages against CDCR or CSATF in this action. Further, as discussed below, Plaintiff's request for injunctive relief is now moot.

### B. Federal Rule of Civil Procedure 18 and 20

Plaintiff may not bring unrelated claims against unrelated parties in a single action. Fed. R. Civ. P. 18(a), 20(a)(2); Owens v. Hinsley, 635 F.3d 950, 952 (7th Cir. 2011); George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007). Plaintiff may bring a claim against multiple defendants so long as (1) the claim arises out of the same transaction or occurrence, or series of transactions and occurrences, and (2) there are commons questions of law or fact. Fed. R. Civ. P. 20(a)(2); Coughlin v. Rogers, 130 F.3d 1348, 1351 (9th Cir. 1997). The "same transaction" requirement refers to similarity in the factual background of a claim. Id. at 1349. Only if the defendants are properly joined under Rule 20(a) will the Court review the other claims to determine if they may be joined under Rule 18(a), which permits the joinder of multiple claims against the same party.

Plaintiff may not raise different claims against different defendants in a single action. For instance, Plaintiff may not, in a single case, assert a claim against Defendant Kokor for events in 2015 related to his medical treatment while simultaneously asserting claim against Defendant Igbinosa related to Plaintiff's medical treatment in 2016. Unrelated claims involving multiple defendants belong in different suits. Plaintiff may not simply assert all claims related to his medical care during the entirety of his incarceration at CSATF in a single suit.

### C. Eighth Amendment

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," Simmons v. Navajo Cty. Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at 1096.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–106). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the

victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

Further, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

Defendant Kokor

With respect to Defendant Kokor's treatment of Plaintiff between January 3, 2015, and his subsequent hospitalization on December 24, 2015, Plaintiff's allegations are not sufficient to state a cognizable claim for deliberate indifference to serious medical needs. At best, Plaintiff has asserted a claim for negligence or medical malpractice, which does not rise to the level of an Eighth Amendment violation. Further, Plaintiff's complaint does not include any factual allegations suggesting that Defendant Kokor was present on December 24, 2015, the date that Plaintiff required hospitalization, and failed to provide any treatment.

With respect to the period after Plaintiff's hospitalization Defendant Kokor, Plaintiff's complaint appears to suggest only a difference of opinion concerning what medical care was appropriate, which will not support a deliberate indifference claim. Plaintiff has not demonstrated that the course of treatment chosen by Dr. Kokor was medically unacceptable or that Plaintiff suffered any harm from Dr. Kokor's treatment following Plaintiff's hospitalization through February 19, 2016.

14

### Defendant Enenmoh

Plaintiff complains that on February 19, 2016, Defendant Dr. J. Enenmoh affirmed Dr. Kokor's treatment plan and denied Plaintiff's appeal. Plaintiff's allegations are insufficient to state a cognizable claim against Defendant Enenmoh. There is no indication that Defendant Enenmoh knew of a serious medical need that was not being treated by Plaintiff's primary care physician or that Plaintiff suffered any harm from Defendant Enenmoh's affirmance of the appeal.

### Defendant Cryer

Plaintiff alleges that Defendant Cryer received information regarding Plaintiff's appeal from Nurse Carrasquillo. Plaintiff's allegations are insufficient to state a cognizable claim against Defendant Cryer. There is no indication from the allegations that Defendant Cryer knew that Plaintiff suffered from a serious medical need or was not receiving treatment or that Plaintiff was at risk of serious harm.

### Defendant Hashemi

Plaintiff alleges that on August 10, 2016, Defendant Nastran Hashemi re-prescribed Plaintiff's medication without consultation. Plaintiff's allegation is not sufficient to state a cognizable deliberate indifference claim against Defendant Hashemi. Plaintiff's mere disagreement with treatment will not support an Eighth Amendment claim.

### Defendant Ugwueze

Plaintiff's allegations involving Defendant Ugwueze concern review of Plaintiff's treatment plan and appeal. As previously stated, however, Plaintiff's disagreement with treatment recommendations is not sufficient to support an Eighth Amendment claim.

### Defendant Roberts

Plaintiff alleges that he submitted Plaintiff submitted a Health Care Services Request form on April 19, 2016, which was received by Defendant Roberts. Plaintiff further alleges that Defendant Roberts did not refer Plaintiff to his primary care physician despite Plaintiff's report that he could not take ibuprofen because of the problems with his abdomen. Defendant Roberts allegedly told Plaintiff to "man up" and wait a month for the doctor. Defendant Roberts also claimed that Plaintiff had refused pain medication.

Plaintiff's allegations are not sufficient to demonstrate deliberate indifference to serious medical needs by Defendant Roberts. There is no indication that Plaintiff was suffering pain or was experiencing a serious medical need at the time of the alleged incident involving Defendant Roberts. There also is no indication that Plaintiff suffered any harm based on Defendant Roberts' reported failure to refer Plaintiff to his primary care physician. According to the allegations in the complaint, Plaintiff did not request any further treatment until May 11, 2016.

Defendant Stronach,

Plaintiff alleges that on March 25, 2015, he submitted a Health Care Services Request form for pain, drowsiness, and stomach problems. The form was received by Defendant Stronach and she met with Plaintiff the following day. Plaintiff further alleges that Defendant Stronach made light of Plaintiff's complaints, but conferred with Defendant Kokor. Defendant Stronach then instructed Plaintiff to take ibuprofen and Defendant Kokor ordered routine blood work, which was normal.

Plaintiff's allegations involving Defendant Stronach are insufficient to state a claim for deliberate indifference to serious medical needs. Plaintiff's mere disagreement with the treatment that he received does not rise to the level of an Eighth Amendment claim.

Defendant Villasenor

Plaintiff alleges only that Defendant Villasenor administered him oxygen on May 11, 2016, after Plaintiff collapsed. There is no indication from Plaintiff's allegations that Defendant Villasenor failed to respond to any serious medical need. Plaintiff's complaint therefore fails to state a cognizable claim against Defendant Villasenor.

Defendant Arietta

Plaintiff's allegations involving Defendant Arietta relate to the purported "screening out" of Plaintiff's health care services requests. Plaintiff's allegations are not sufficient to state a cognizable claim against Defendant Arietta. According to the amended complaint, Defendant Arietta continually advised Plaintiff to take ibuprofen and essentially continue with his treatment. There is no indication that Defendant Arietta failed to respond to a serious medical need or that Plaintiff suffered harm from any alleged screen out of any request for services. Plaintiff's

disagreement with the recommended treatment does not rise to the level of an Eighth Amendment violation.

### Defendant Pacheco

Plaintiff alleges that he submitted a Health Care Services Request form a health care services form on May 29, 2016, which was screened out by Defendant M. Pacheco. However, two days later, Plaintiff met with Defendant Pacheco regarding his issues, including pain and the inability to take NSAIDs. Defendant Pacheco reportedly instructed Plaintiff to take ibuprofen.

Plaintiff's allegations involving Defendant Pacheco are insufficient to state a claim for deliberate indifference to serious medical needs. Plaintiff's mere disagreement with the treatment that he received does not rise to the level of an Eighth Amendment claim.

### Does 1-3

At the pleading stage, the Court finds that Plaintiff has stated a cognizable claim against Defendants Does 1-3 for deliberate indifference to serious medical needs in violation of the Eighth Amendment. However, "[a]s a general rule, the use of 'John Doe' to identify a defendant is not favored." Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir.1980). Plaintiff is advised that John Doe or Jane Doe defendants (i.e., unknown defendants) cannot be served by the United States Marshal until Plaintiff has identified them as actual individuals and amended his complaint to substitute names for John Doe.

### D. Injunctive Relief

Plaintiff is no longer housed at CSATF, where he alleges the incidents at issue occurred, and where the prison officials are employed. Therefore, any injunctive relief he seeks against the officials at CSATF is moot. See Andrews v. Cervantes, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007) (prisoner's claims for injunctive relief generally become moot upon transfer) (citing Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (holding claims for injunctive relief "relating to [a prison's] policies are moot" when the prisoner has been moved and "he has demonstrated no reasonable expectation of returning to [the prison]")).

### IV. Conclusion and Recommendation

Based on the foregoing, the Court finds that Plaintiff's first amended complaint states a

cognizable claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment against Defendants Doe 1 and Doe 3.  However, Plaintiff's amended complaint fails to state any other cognizable claim for relief against the remaining defendants.  Despite being provided with the relevant legal standards, Plaintiff has been unable to cure the remaining deficiencies in his complaint.  Further leave to amend is not warranted.  Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).

Accordingly, IT IS HEREBY RECOMMENDED as follows:

1. This action proceed on Plaintiff's first amended complaint, filed on August 30, 2018, against Defendants Doe 1 and Doe 3 for deliberate indifference to serious medical needs in violation of the Eighth Amendment;

2. All other claims and defendants, including any claim for injunctive relief, be dismissed from this action based on Plaintiff's failure to state claims upon which relief may be granted.

These Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendation, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **July 15, 2019**　　　　　　　/s/ *Barbara A. McAuliffe*
　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE